UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRAIG HAMELIN and MICHAEL
MCCARRON, Individually and as representatives
of all others similarly situated

        Plaintiffs,

v.

KINDER MORGAN, INC., KINDER
MORGAN ENERGY PARTNERS, L.P,
TENNESSEE GAS PIPELINE CO., LLC.

        Defendants.

Case No.: 3:21-cv-30054-MGM

**LEAVE TO FILE GRANTED ON
JULY 15, 2022**

## FIRST AMENDED COMPLAINT AND JURY DEMAND

NOW COMES the Plaintiffs, Craig Hamelin and Michael McCarron, individually and as representative of all others similarly situated, by and through their attorneys and in their Complaint against Defendants Kinder Morgan, Inc., Kinder Morgan Energy Partners, L.P., Tennessee Gas Pipeline Co., LLC hereby states as follows.

### INTRODUCTION

1.     This is a civil action to recover for injuries Crain Hamelin sustained after being exposed to radiation during the course of his employment. This is also a civil action for medical monitoring for the putative class members defined below who were caused to be exposed to dangerous levels of radiation during the course of their employment causing them to be at an increased risk for developing cancers.

2.     Plaintiffs and class members have been exposed to hazardous substances, including, but not limited to alpha and beta particles (including radon) and gamma rays while conducting their jobs on gas pipelines and in storage vaults.

3.     Despite having knowledge for decades of potential radiation exposure, Defendants

failed to inform persons likely to be exposed to dangerous material and failed to assure those likely to be exposed to dangerous material had adequate personal protective equipment or other devices to track and protect them from exposure. As a result of Defendants concealment of the truth, Plaintiffs and class members were unnecessarily exposed to dangerous levels of ionizing radiation during their employment.

4. Forms of ionizing radiation are recognized as being human carcinogens by every major human health and regulatory body, including the EPA and International Agency for Research on Cancer.

5. Exposure to this radiation can increase the risk of numerous cancers.

6. Neither Plaintiffs nor the class members could have known what the defendants knew about the dangerous exposures. As a result, Mr. Hamelin developed Polycythemia vera, a rare blood cancer. The class members, having been exposed to radiation, including radon gas, have a significant higher risk for developing cancer of the blood, bone and lungs.

## PARTIES

7. Craig Hamelin is a resident of Cheshire, Berkshire County Massachusetts. Mr. Hamelin was an employee of The Berkshire Gas Company from 1987 to 2018.

8. Michael McCarron is a resident of Dalton, Berkshire County Massachusetts. Mr. McCarron was an employee of The Berkshire Gas Company from 1987 2019.

9. Kinder Morgan, Inc., ("KMI") is a Delaware corporation with its principal place of business in Harris County, Texas.

10. Kinder Morgan Energy Partners, L.P., ("KMP") is a Delaware limited partnership with its principal place of business in Harris County, Texas. Kinder Morgan Energy Partners, L.P. is owned in part by Kinder Morgan, Inc.

11.    KMP is owned by KMI.

12.    Tennessee Gas Pipeline Co., L.L.C. ("TGP Co."), is a Delaware limited liability company with its principal place of business in Harris County, Texas.

13.    Tennessee Gas Pipeline Co., L.L.C., is a wholly owned subsidiary of KMP.

## JURISDICTION and VENUE

14.    This Court has jurisdiction over the subject matter of this action pursuant to G.L. c. 212, 4 § 4.  This Court has personal jurisdiction over the Defendants pursuant to G.L. c. 223A, §§ 2 and 3.

15.    Venue is proper in Berkshire County pursuant to G.L. c. 223, §§ 7 and 8(4) because the Defendants were doing business in and because tortious conduct described herein took place in Berkshire County.

## CLASS ACTION ALLEGATIONS

16.    This Class Action is being filed by the Plaintiffs, pursuant to Massachusetts Rule of Civil Procedure 23, on behalf of themselves and others similarly situated for medical monitoring.

17.    Plaintiffs seek to certify the following class, defined as:

All persons who ever worked on gas pipelines connected to the Tennessee Gas Pipeline for a minimum of four years and have not yet been diagnosed with bone, blood or lung cancer.

18.    To the extent revealed by discovery and investigation, there may be additional appropriate classes and/or subclasses from the above class definition which are broader and/or narrower in time or scope of exposure.

19.    Numerosity – Mass.R.Civ.P. 23(a)(1): The members of the class are so numerous that joinder of all members is impractical.

20.    The number of employees who have been exposed to radiation from the TGP who were employed by gas companies spans decades. Plaintiffs do not know the exact number of

members of the Class, but Plaintiffs reasonably believe that Class members number well into the hundreds.

21.     Commonality – Mass.R.Civ.P. 23(a)(2): There are common questions of law and fact that affect the rights of every member of the class, and type of relief sought are common to every member of the class. The same conduct by the Defendants has or will injure each member of the Class. The same relief is being sought by each class member.

22.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy, in satisfaction of Mass.R.Civ.P. 23(a)(2). Common questions of law and/or fact common to the class include, but are not limited to:

    a. Whether Defendants were negligent in concealing information about radiation and/or radon exposure from those likely to be exposed;

    b. Whether Defendants were negligent in not assuring adequate protective equipment to those likely to be exposed;

    c. Whether Defendants were negligent in not providing adequate testing to assess the levels of radiation and/or radon to which workerss were being exposed;

    d. Whether class members, through Defendants acts and/or omissions have been exposed to levels of radiation and/or radon that could cause disease;

    e. Whether a monitoring procedure exists that makes early detection of disease possible;

    f. Whether the prescribed monitoring regiment is different from that normally recommended in the absence of exposure to toxic and hazardous substances;

    g. Whether the prescribed monitoring regiment is reasonable and appropriate according to contemporary medical and scientific principles; and

    h. Whether, as a proximate result of Defendants' acts, the class members are at a significantly increased risk of disease due to exposures to radiation and/or, such that they will benefit from ongoing medical monitoring.

23.     These questions of law and/or fact are common to the class and predominate over any questions affecting only individual class members.

24.     Typicality – Mass.R.Civ.P. 23(a)(3): The claims of Michael McCarron are typical of the claims of the class members in that all claims are based upon the same factual and legal theories. The principal issues in the matter involve the Defendants' conduct in concealing the fact that the gas line workers were being exposed to dangerous radiation; failing to ensure the employees were adequately protected; failing to properly monitor the levels of radiation; whether the radiation exposure could cause DNA damage; and whether medical monitoring would provide early protection for the class against advance stages of cancer.

25.     Adequacy – Mass.R.Civ.P. 23(a)(4): Plaintiff Michael McCarron will fairly and adequately represent and protect the interest of the class members, as required by Mass.R.Civ.P. 23(a)(4). Plaintiff has retained counsel with substantial experience in complex mass tort injury in Massachusetts and across the country. Plaintiff and counsel are committed to vigorously prosecuting this action on behalf of the class, and they have financial resources to do so. Neither Plaintiff nor counsel has any interest adverse to the class.

26.     Class certification is appropriate pursuant to Mass.R.Civ.P. 23(b)(1) because the prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants and/or because adjudications respecting individual members of the class would, as a practical matter, be dispositive of the interests of the other members or would risk substantially impairing or impending their ability to prosecute their interests.

27.     Class certification is appropriate pursuant to Mass.R.Civ.P. 23(b)(1) because Defendants have acted or refused to act on grounds generally applicable to all members of the class, thereby making relief in the form

**FACTUAL BACKGROUND**

28.     Before 1950 in Massachusetts, natural gas was manufactured from coal or oil

5

through chemical processes, whereas today, natural gas is sourced from hydraulic fracking.

29.     The fracking wells, which differ from water wells, are volumes of underground earth and stone that have absorbed within them natural gas able to be extracted.

30.     The gas flows from wells through interstate transmission pipelines. Approximately 1,000 miles of interstate gas transmission lines exist in Massachusetts and are owned and operated by three companies: Algonquin Gas Transmission Company, Maritimes and Northeast Pipelines Company, and Tennessee Gas Pipeline Company ("TGP"), the latter a wholly owned subsidiary of Kinder Morgan and the largest transporter of petroleum products in North America and supplier of almost 38% of U.S. consumed natural gas.

31.     Kinder Morgan Energy Partners, L.P. is a pipeline transportation and energy storage company and one of the largest publicly traded pipeline limited partnerships in America. It owns an interest in or operates approximately 29,000 miles of pipelines and 180 terminals.

32.     The general partner of KMP is owned by Kinder Morgan, Inc. (NYSE: KMI). Kinder Morgan is the largest midstream and the third largest energy company in North America with a combined enterprise value of approximately $100 billion.

33.     It owns an interest in or operates approximately 75,000 miles of pipelines and 180 terminals. Its pipelines transport natural gas, gasoline, crude oil, $CO_2$ and other products, and its terminals store petroleum products and chemicals and handle such products as ethanol, coal, petroleum coke and steel.

34.     Tennessee Gas Pipeline is a set of natural gas pipelines that run from the Texas and Louisiana coast through Arkansas, Mississippi, Alabama, Tennessee, Kentucky, Ohio and Pennsylvania to deliver natural gas in West Virginia, New Jersey, New York, and New England.

35.    The approximately 12,000-mile long TGP system operated by the Tennessee Gas Pipeline Company is a subsidiary of Kinder Morgan. It is one of the largest pipeline systems in the United States.

36.    TGP has a design capacity of about 7.5 billion cubic feet (Bcf) per day.

37.    TGP serves the Northeast and has access to the growing Marcellus and Utica shale plays.

38.    Most of the natural gas that enters Massachusetts by pipeline comes through New York and Rhode Island. The natural gas that is not consumed in the state is typically sent by pipeline to Rhode Island and New Hampshire. A small amount is sent to Connecticut.

39.    Most of the natural gas delivered to Massachusetts is produced in the Marcellus Shale basin in Pennsylvania.

40.    The Earth's crust has a lot of radioactive elements that are concentrated deep in its layers.

41.    It's common knowledge that many minerals extracted from the earth contain low levels of radioactive elements like uranium, thorium, radium, zirconium and phosphate. Referred to as naturally occurring radioactive material (NORM), these are often processed or transported in a manner that can increase the concentration of these radioactive elements.

42.    Oil and gas drilling activities commonly produce NORM or technologically enhanced NORM (TENORM) because reservoirs often include minerals that include amounts of radioactivity.

43.    The most common radioactive element found in oil and gas production is radium, which tends to precipitate out as scale on piping, or exist in residual concentrations in produced fluids.

44.     Radium has chemical properties similar to calcium and can produce the same effects on piping. Just as calcium in hard water can produce scale as a result of an increase in pH or a decrease in temperature or pressure, radium can generate scale from produced fluids, resulting in TENORM.

45.     As produced fluids are brought to the surface, temperature and pressure changes can cause scale on tubular goods and materials. Mud pumps, heater-treaters and other drilling and processing equipment can be subject to significant changes in temperature and pressure, resulting in a buildup of this scale.

46.     The downstream interior of a pipe bend can experience lower pressure than the outside of the bend and see build-up of scale. Thus, NORM contained in produced fluids can lead to TENORM scale in equipment and elevated levels of radioactivity.

47.     Pigging waste can be another source of TENORM. When pigs — pipe maintenance devices — are run through pipelines to clean out scale and other residual materials, the accumulated material may come out in various forms ranging from dry to sludge to liquids.

48.     Pigging waste should be recycled when possible, and TENORM evaluations should but were not performed at all locations relevant to this case.

49.     Pigging waste is hazardous by characteristic. If this waste contains TENORM over trigger levels, it has the potential to be classified as "mixed waste" or "combined waste" and fall under regulatory requirements for handling and disposal. As with filters, disposal facilities sometimes are unlicensed and thus unwilling to accept this material.

50.     Radium—the most abundant radionuclide in brine—is often measured in picocuries per liter of substance, and it's so dangerous that it's usually subject to very tight restrictions even at hazardous-waste sites.

51.    The Nuclear Regulatory Commission requires industrial discharges to remain below 60 for radium isotopes.

52.    While any exposure to radioactive materials is hazardous, breathing it in or ingesting it is the worst type of exposure. The radioactive particles can be blocked by the skin, but radium attaches to dust, which makes it easy to accidentally inhale or ingest. Once inside the body, it's known to cause bone cancers called sarcomas, decay into other radioactive elements, cause blood cancers, and even cause death.

53.    Radioactivity is typically elevated in shale relative to other rock types and the Marcellus Shale is especially enriched.

54.    Drilling and production of shale has the ability to mobilize radioactivity towards the surface where it could either concentrate or infiltrate aquifers.

55.    Shales currently undergoing natural gas extraction - like the Marcellus, Barnett, and Utica - were all deposited in basins millions of years ago (about 390 million years ago is the current estimate).

56.    Since the Marcellus shale, for example, has high organic content (that gives the shale its black color) ranging from 2 to 14 percent or so, the radioactive particles will also be adsorbed by the shale, in addition to the particles precipitating on the shale.

57.    These two mechanisms explain the significant radioactivity of the Marcellus shale.

58.    Disturbing these shale deposits and bringing them to the surface or bringing the associated gas to the surface, will create additional exposure to radioactive material during drilling, wastewater treatment, waste handling, gas storage transmission and pigging.

59.    Gas industry workers almost certainly face an increased risk of cancer if they

worked in a confined space where radon gas, a leading cause of lung cancer and a derivative of radium, can collect to dangerous levels.

**Radioactivity and Human Health**

60.    Radiation is energy in the form of particles or waves traveling through space.

61.    Radiation comes in two main forms – ionized and non-ionized.

62.    Ionization means that a particle or wave is so high energy that it can break chemical bonds and therefore can give a charge to an atom that interacts with it. This form of radiation is relatively low-energy so it isn't as harmful as ionized radiation.

63.    Ionized radiation has so much energy that it can change the atomic structure of molecules in your body and therefore can damage DNA - which can lead to cancer.

64.    The three other main types of ionized radiation are alpha particles ($\alpha$), beta particles ($\beta$), and gamma rays ($\gamma$).

65.    Alpha particles are made up of protons and neutrons from decaying unstable radioactive elements like radium and uranium. If these particles enter the body through inhalation or ingestion, they can cause a lot of damage because they have the highest ionizing power (the power to damage other molecules).

66.    Radium-226 and Radon-222 emit alpha particles.

67.    Radon gas exposure is the second leading cause of lung cancer because it is a naturally occurring radioactive gas. If inhaled over a long period of time, it can cause a lot of damage to the lungs because it emits alpha particles.

68.    According to the Environmental Protection Agency ("EPA"), "there is no known safe level of exposure to radon…"

69.    Beta particles can penetrate some objects and have medium ionization power (their

ability to cause damage). Think of a beta particle like a bowling ball rolling down a hill and hitting everything in its path. Since beta particles are made up of electrons, they are much smaller than alpha particles. However, because of their smaller size they can penetrate objects, like human skin. The biggest danger is ingesting these particles in some way through dust or water that contains beta-emitting radionuclides.

70.     Radium-228 emits beta particles.

71.     Gamma rays are rays (on the electromagnetic spectrum like radio waves and light) and not particles. They are high frequency and high energy with no mass so they can pass right through the human body causing widespread systemic damage. They can only be blocked by a very solid object like several inches of lead.

72.     Gamma rays often coincide with alpha and beta particles, so for example Radium-226 emits both alpha particles and gamma rays.

73.     Shale is often so high in gamma emitting radionuclides that gamma ray measurements are used to find the presence of shale gas.

74.     Exposure to alpha and beta particles can be even more damaging than gamma rays if they are ingested or inhaled.

75.     Any exposure to ionized radiation can cause cell damage, which can eventually lead to health effects like cancer.

76.     Long-term exposure to low levels of radiation, such as with inhaling radon, is harmful.

77.     Ingesting or breathing in alpha-emitting compounds such as radium-226, which can bind to soil or dissolve in water, is very harmful to the human body.

78.     Radium and radon exposure as known to cause cancer.

**The Marcellus Shale**

79.    The Marcellus Shale is one of the largest productive oil and gas shales in the country and has one of the highest concentrations of radioactive compounds.

80.    Marcellus Shale is an enormous natural gas bearing layer of shale rock approximately 1 mile beneath the earth's surface, extending from New York's Southern Tier, through the western half of Pennsylvania and into Ohio and West Virginia. It is estimated to be the second largest natural gas bearing shale formation in the world.

81.    Small-scale drilling in Marcellus Shale has occurred for decades with rigs boring vertical wells into the shale bed that intersect with horizontal fractures in the formation where the gas is contained.

82.    In the early 2000s, however, advances in drilling technology enabled rigs to drill deep into the shale layer and then to drill horizontally along fracture lines. The gas is recovered using a technique called hydraulic fracturing (or "fracking") in which large quantities of water, sand and chemicals are forced into the well, causing the shale layers to break apart along fracture lines, releasing the gas contained within the rock.

83.    According to the 2010 study *Radioactivity in Marcellus Shale* by Dr. Marvin Resnikoff, uranium content in the Marcellus shale was found to be 59.4 pCi/g (compared to a background uranium content of 2.8 pCi/g, making this 20x higher than background levels).

**Gas and Oil Industry Has Known for Decades That They Were Exposing Employees to Radiation**

84.    In 1982 a report from the American Petroleum Institute called "An Analysis of the Impact of the Regulation of Radionuclides as a Hazardous Air Pollutant on the Petroleum Industry" says: "Almost all materials of interest and use to the petroleum industry contain measurable quantities of radionuclides…API should be more concerned."  The report concluded

that "the regulation of radionuclides could impose a severe burden on API member companies, and it would be prudent to monitor closely both regulatory actions."

85.    In 1990, the Oil and Gas Journal  said: "In varying degrees of severity, NORM [naturally occurring radioactive material] contamination may exist at every oil and gas production site and related facilities . . . a potential health hazard to personnel . . .   a possible public relations problem for the industry."

86.    Despite this knowledge none of the defendants disclosed this information to its employees and did not (until very recently) provide adequate protection against radiation exposure.

87.    Craig Hamelin, Michael McCarron and others similarly situated were exposed to dangerous levels of radiation and radon during the course of their employment working on gas lines owned and/or operated by the defendants.

88.    As a result of his exposure to which he was unaware, it was confirmed that Mr. Hamelin had developed polycythemia vera, a rare blood cancer. Since that time, Mr. Hamelin has undergone multiple rounds of chemotherapy, pain suffering and is no longer able to work.

89.    As a result of Mr. McCarron and other class members exposure to dangerous levels of radiation and radon gas, they are at a significantly increased risk for developing disease including cancer of the blood, bones and lung.

## Defendants Have a Long History of Safety Failures

90.    Upon information and belief, from 2006 to 2017, 27 federal enforcement actions were initiated against TGP, with $422,500 in penalties. Federal inspectors were onsite at TGP locations for 661 days plus 187 days of accident investigations.

91.    Upon information and belief, from 2006 to 2017, faulty infrastructure caused most of TGP's onshore gas transmission pipeline accidents. Corrosion (internal or external), equipment

malfunctions, manufacturing defects, faulty welds, and incorrect installation together accounted

for 56% of leaks and more than $90 million in property

damage.https://en.wikipedia.org/wiki/Tennessee_Gas_Pipeline - cite_note-18-

92.     Upon information and belief, Tennessee Gas Pipeline had at least 257 significant

failures (leaks, fires, and explosions) from 1986 to 2017. This number does not include the less

notable accidents that did not meet the criteria for reporting.

93.     The incidents below are merely a small representative sample of incidents in

Massachusetts alone:

- On September 24, 2004, in Hopkinton, Massachusetts, a TGP leak occurred in 24" diameter pipe at a "high consequence area" just upstream of a compressor station, in pipe manufactured in 1977. 28 people were evacuated as a precaution. The leak was apparently due to the pipe resting on a rock ledge which damaged the pipe, causing a pinhole perforation.
- On February 10, 2015, in Hopkinton, Massachusetts, cold weather caused "natural force damage" to a Tennessee Gas Pipeline when freezing rain or snow entered a vent then froze.
- On February 14, 2016, in Charlton, Massachusetts, Kinder Morgan's Tennessee Gas Pipeline transmission line failed due to a malfunction of control or relief equipment, releasing $16,598 worth of gas.
- On November 20, 2017, in Agawam, Massachusetts, an operator error on TGP's Connecticut Expansion Project's pipeline test at the compressor station discharged 16,500 gallons of hazardous wastewater onto the soil of the compressor station yard; the wastewater contained heavy metals, lead, and carcinogens such as tetrachloroethylene and phthalate.
- On November 29, 2017, in Richmond, Massachusetts, overpressure (for unknown cause) triggered a relief valve to open at a TGP pigging station for a 40-minute blowdown, releasing gas into a residential neighborhood. When contacted, TGP personnel had no idea that there was a problem.

**Defendants Have Significantly Violated Federal Safety Standard Regulations**

94.     At all relevant times, Defendants were required to conform to the requirements

proscribed in 29 CFR 1910.1096, Occupational Safety and Health Standards, Toxic and Hazardous

Substances.

95.     At all relevant times, Defendants violated this federal regulation in a number of ways, including but not limited to the following:

a.  Failing to monitor the levels of radiation and/or radon in locations where it knew its employees could be exposed;

b.  Failing to survey compliance with the provisions of this section;

c.  Failing to ensure occupational dose limits were not exceeded;

d.  Failing to maintain adequate past and current exposure records;

e.  Failing to communicate with its employees and workers a report of employees exposure;

f.  Failing to maintain adequate records of radiation and radon levels;

g.  Failing to supply its employees and other workers appropriate personal protective equipment;

h.  Failing to supply its employees with appropriate personal monitoring equipment (dosimeters);

i.  Failing to equip high radiation areas with appropriate radiation alarms;

j.  Failing to communicate the dangers to its employees and other workers being exposed;

k.  Failing to post caution signs, labels and signals; and

l.  Failing to provide appropriate instruction and training to employees and other workers being exposed to radiation and radon.

**Plaintiffs had No Idea They Had Been Exposed to Radiation and Radon Until April 2019**

96.     Plaintiffs have suffered an illness that has a latency period and does not arise until many years after exposure. Plaintiffs could not have been aware of Plaintiffs' causes of action against Defendants until both discovering their injuries and discovering the wrongful acts of the Defendants.

97.     Plaintiffs did not know that their jobs were exposing them to radiation until April

2019 when Plaintiffs witnessed Defendants taking radiation readings on a gas line. Defendants were in full protection gear that was never available to Plaintiffs.

98.    Defendants concealed for decades the fact that Plaintiffs were being exposed to dangerous levels of radiation and radon.

99.    The discovery rule applies, and the statute of limitations has been tolled until the day the Plaintiffs knew or had reason to know that Mr. Hamelin's cancer was caused by his exposure and that others similarly situation was similarly exposed suffering cellular damage.

100.    As a result of Defendants actions and inactions, Plaintiffs were unaware, and could not reasonably know or have learned through reasonable diligence, that Plaintiffs were exposed to the risks detailed and alleged herein and that those risks were the proximate result of the Defendants acts and omissions.

101.    Defendants were under a duty to disclose the true character, quality, and nature of the Plaintiffs' exposure to dangerous levels of radiation and radon. Defendants concealed information about these risks. Defendants knew that this information was not available to Plaintiffs, Plaintiffs medical providers, and/or their health facilities, yet Defendants failed to disclose the information to them.

102.    Plaintiffs did not know they had a cause of action against Defendants or by the exercise of due diligence (such as seeking medical attention) could have known that Plaintiffs might have a cause of action against Defendants due to Defendants' negligence and fraudulent concealment.  Rather, Plaintiffs relied to their detriment on Defendants' duty to protect its workers.

**Early Detection Will Significantly Reduce the Risk of Death and More Severe Disease**

103.    Both radiation and radon increase the risk for developing cancer. Like with many other contaminants or toxins, our genetic material, or DNA, is the primary target.

104.    Radiation can interact with DNA directly and cause damage by breaking bonds in the DNA or indirectly by breaking water molecules surrounding the DNA. When these water molecules are broken, they produce free radicals–unstable oxygen molecules that can damage cells and organs.

105.    Once a cell is damaged, three things can happen: it can repair; 1) The cell repairs itself. The cell would then go back to normal; 2) The cell damage is not repaired or is incorrectly repaired, so the cell is changed. This change may eventually lead to cancer; or 3) There is too much damage to the cell, and the cell dies. Cell death is not always a bad option.

106.    If a few radiation-damaged cells die, your body will recover and you do not have the risk of those cells potentially turning into cancer.

107.    However, widespread cell death, such as that caused by high radiation doses, can lead to organ failure and, ultimately, death.

108.    Lung cancer is the leading cause of cancer-related death in America.

109.    After cigarette smoking, radon is the second leading cause of lung cancer in America.

110.    Usually symptoms of lung cancer do not appear until the disease is already at an advanced stage. Even when lung cancer does cause symptoms, many people may mistake them for other problems, such as an infection or long-term effects from smoking. This may delay the diagnosis.

111.    Screening is used to detect lung cancer early, when it is more likely to be curable. If lung cancer is caught before it spreads, the likelihood of surviving 5 years or more improves to at least 59 percent.

112.    A low-dose CT scan is a special kind of X-ray that takes multiple pictures as one

lies on a table that slides in and out of the machine. A computer then combines these images into a detailed picture of lungs. A study on early detection of lung cancer found that the low-dose cancer screening test can reduce mortality for those at high risk.

**COUNT I**
**NEGLIGENCE**
**(Against all Defendants)**

113.    Plaintiffs incorporate by reference every other paragraph of this Complaint as if each were set forth fully and completely herein.

114.    At all relevant times, the Defendants were engaged in the business of supplying natural gas throughout the relevant areas. With the supply of natural gas, the Defendants were responsible for maintaining the gas lines in a safe and responsible manner.

115.    At all relevant times, the Defendants employed the Plaintiffs and others similarly situated to, in part, maintain the gas lines.

116.    At all relevant times, Defendants expected the Plaintiffs and other similar employees to have close access to the gas and other emissions related to the supply of natural gas.

117.    At all relevant times, Defendants knew that gas line workers would be exposed to ionizing radiation and radon.

118.    Defendants knew or should have known that such exposure is extremely dangerous to the health of individuals.

119.    Defendants had duty to protect its employees and others exposed to the gas lines from exposure to ionizing radiation and radon.

120.    Plaintiffs could not, by exercise of reasonable care, have discovered the dangerous exposures to radiation and radon or perceived its dangers.

121.    Defendants failed to protect gas line workers and others exposed to radiation and radon by:

a. Failing to monitor the levels of radiation in locations where it knew gas line workers could be exposed;

b. Failing to ensure occupational dose limits were not exceeded;

c. Failing to supply its employees and other workers appropriate personal protective equipment;

d. Failing to assure gas line workers with appropriate personal monitoring equipment (dosimeters);

e. Failing to communicate the dangers to workers being exposed;

f. Failing to post caution signs, labels and signals; and

g. Failing to provide appropriate instruction and training to gas line workers being exposed to radiation and radon.

122. Defendants' breaches of their duties outlined above caused Plaintiffs and others similarly situated to be exposed to dangerous levels of radiation and radon for years.

123. As a direct and proximate result of the Defendants' negligence, Plaintiffs have been injured. Specifically, Mr. Hamelin developed a rare form of leukemia and has been caused to suffer severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, and economic damages.

124. Class action Plaintiffs have been caused to suffer cellular damage as a result of the Defendants' negligence thereby causing them to be at much higher risk for the development of disease, specifically cancer.

**COUNT II**
**FRAUDULENT CONCEALMENT**
**(Against all Defendants)**

125. Plaintiffs incorporate by reference every other paragraph of this Complaint as if each were set forth fully and completely herein.

126. Defendants had a duty, both statutorily and common law duty to disclose to Plaintiffs and others similarly situated the fact that they were regularly being exposed to radiation

and/or radon in the course of their employment.

127.    At least as of 1982, Defendants were aware that employees working in the gas and oil industry were routinely exposed to significant and dangerous levels of radiation and/or radon.

128.    Instead of informing workers of being exposed, Defendants took steps to withhold this information in violation of their duty to disclose and in violation of OSHA regulations.

129.    The information that Plaintiffs and others similarly situated were being exposed to dangerous levels of radiation and radon, was material to their ability to protect themselves making the purposeful concealment material.

130.    When, in2019, Plaintiffs witnessed Defendants taking radiation readings, Plaintiffs requested information about the readings. Defendants took steps to purposefully hide and conceal the information obtained about the levels of radiation workers were being exposed to.

131.    Defendants' purposeful concealment caused Plaintiffs to be exposed to dangerous levels of radiation and radon for years without their knowledge.

132.    As a direct and proximate result of the Defendants' fraudulent concealment, Plaintiffs have been injured. Specifically, Mr. Hamelin developed a rare form of leukemia and has been caused to suffer severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, and economic damages.

## COUNT III
## MEDICAL MONITORING

133.    Plaintiffs incorporates by reference every other paragraph of this Complaint as if each were set forth fully and completely herein.

134.    The Defendants' negligence as detailed above caused the Plaintiffs to be exposed to dangerous levels of radiation and/or radon for many years.

135.    Long-term radiation and radon exposure caused subcellular and cellular changes in

those exposed, like Plaintiffs.

136.    This exposure substantially increases the risk of serious disease, like blood and lung cancer.

137.    Early detection of these types of cancer can result in a significant decrease in the risk of death or severity of illness.

138.    Blood tests, thyroid assessment and low-dose computed tomography ("LDCT") scans are reasonable diagnostic medical examinations that are periodically necessary to identify illness related to radiation and/or radon. There are also additional clinical monitoring tests that will aid Plaintiffs in early detection.

139.    The present value of such tests and care is reasonable.

## **PRAYER FOR RELIEF**

For each and every cause of action listed above, Plaintiffs request that this Court find in Plaintiffs' favor and against Defendants, and that this Court grant Plaintiffs the following relief from Defendants:

a.    An order certifying this action to be a proper class action pursuant to Massachusetts Rule of Civil Procedure 23, establishing an appropriate Class, finding that Plaintiff McCarron is a proper representative of the Class;

b.    Enter judgment for Plaintiffs;

c.    Grant Plaintiffs' costs and attorneys' fees;

d.    Grant Plaintiffs' requests for damages including compensatory, economic and medical monitoring;

e.    Enter an order establishing a medical monitoring program, funded by the Defendants for all members of the Class;

f.    Enter an order establishing a science board, funded by the Defendants to conduct additional research on the future impact of radiation and radon exposure by Class members, in order to improve the effectiveness of the medical monitoring program;

g.  Prejudgment and post-judgment interest;

h.  Grant Plaintiffs such other and further relief as the court may deem just and proper under the circumstances.


Dated:  July 16, 2022                              Respectfully Submitted,

                                                   The Plaintiffs,
                                                   By their Attorney,


                                                   */s/ Paula S. Bliss*_____
                                                   Paula S. Bliss, Esq. (BBO #652361)
                                                   JUSTICE LAW COLLABORATIVE, LLC
                                                   19 Belmont Street
                                                   South Easton, MA  02375
                                                   Tel:  508-230-2700
                                                   paula@justicelc.com


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 16th day of July, 2022, this First Amended Complaint was served via electronic delivery to Defendants' counsel via CM/ECF system which will forward copies to Counsel of Record.


                                                   */s/  Paula S. Bliss*_____
                                                   Paula S. Bliss, Esq.